1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CANDY CLAY,

11           Plaintiff,                         No. 2:12-cv-0606-KJN

12       v.

13   COMMISSIONER OF
     SOCIAL SECURITY,
14
             Defendant.                    <u>ORDER</u>
15   _____/

16           In this action, plaintiff seeks judicial review of a final decision of the

17   Commissioner of Social Security ("Commissioner").[1]  After plaintiff turned 18, the

18   Commissioner re-determined plaintiff's eligibility for Supplemental Security Income ("SSI")

19   under Title XVI of the Social Security Act ("Act") based on the rules for determining disability

20   in adults, and found that plaintiff's disability had ended on May 1, 2009.  In her motion for

21   summary judgment, plaintiff contends that the Commissioner erred in determining that plaintiff's

22   disability had ceased.  (Dkt. No. 14.)  The Commissioner filed an opposition to plaintiff's motion

23   and a cross-motion for summary judgment.  (Dkt. No. 15.)  Thereafter, plaintiff filed a reply

24   _____

25           [1] This case was referred to the undersigned pursuant to E.D. Cal. L.R. 302(c)(15) and 28
     U.S.C. § 636(c), and both parties voluntarily consented to proceed before a United States
26   Magistrate Judge.  (Dkt. Nos. 7, 10.)

                                             1

1   brief.  (Dkt. No. 16.)  For the reasons that follow, the court denies plaintiff's motion for summary

2   judgment, grants the Commissioner's cross-motion for summary judgment, and enters judgment

3   for the Commissioner.

4   I.      BACKGROUND

5               Plaintiff was born on August 9, 1990, has an eleventh grade education, and has no

6   past relevant work.[2]  (Administrative Transcript ("AT") 20, 35, 91-94.)  She received SSI

7   benefits under Title XVI of the Act as a disabled child, primarily due to asthma and a learning

8   disorder.  (AT 207-19.)  After plaintiff turned 18, her eligibility for these benefits was

9   redetermined under the rules for determining disability in adults, and on May 8, 2009, the

10  Commissioner found that plaintiff was no longer disabled as of May 1, 2009.  (AT 10, 91, 95-

11  98.)  On May 12, 2010, this determination was upheld upon reconsideration after a hearing

12  before a state agency disability hearing officer.  (AT 10, 115-24.)  Subsequently, plaintiff

13  requested a hearing before an administrative law judge ("ALJ").  (AT 10, 132-34.)

14              ALJ Theodore Slocum conducted three hearings in this case.  At the first October

15  7, 2010 hearing, the case was continued to allow plaintiff to obtain representation.  (AT 78-87.)

16  At the second December 7, 2010 hearing, the case was again continued to obtain further medical

17  records from plaintiff's treating providers.  (AT 67-77.)  A third hearing was conducted on

18  January 27, 2011.  (AT 29-66.)  Plaintiff did not obtain counsel at the administrative level, and

19  appeared at all three hearings without counsel.  (AT 10.)  After the three hearings, ALJ Slocum

20  became temporarily incapacitated, and the case was reassigned to ALJ Joseph De Pietro.  (Id.)

21  After ALJ De Pietro reviewed the record, as well as the instructions/notes by ALJ Slocum, ALJ

22  De Pietro determined that another hearing was not required.  (Id.)

23  ////

24  ───────────────

25       [2]  Because the parties are familiar with the factual background of this case, including
    plaintiff's medical history, the court does not exhaustively relate those facts here.  The facts
    related to plaintiff's impairments and medical history will be addressed insofar as they are
26  relevant to the issues presented by the parties' respective motions.

1    In a decision dated May 12, 2011, ALJ De Pietro determined that plaintiff's

2    disability had ended on May 1, 2009, and that plaintiff had not become disabled again since that

3    date.  (AT 21-22.)  The ALJ's decision became the final decision of the Commissioner when the

4    Appeals Council denied plaintiff's request for review on February 7, 2012.  (AT 1-3.)

5    Thereafter, plaintiff filed this action in federal district court on March 8, 2012, to obtain judicial

6    review of the Commissioner's final decision.  (Dkt. Nos. 1-3.)

7    II.    ISSUES PRESENTED

8    Plaintiff has raised the following issues: (1) whether the ALJ failed to adequately

9    develop the record; (2) whether the ALJ improperly weighed the medical and psychological

10   opinion evidence; (3) whether the ALJ erroneously found that plaintiff did not have a severe

11   mental impairment; (4) whether the ALJ erred in determining that plaintiff did not meet a listing;

12   and (5) whether the Appeals Council erred in not remanding the case to the ALJ.[3]

13   III.   LEGAL STANDARD

14   The court reviews the Commissioner's decision to determine whether (1) it is

15   based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

16   the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).

17   Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

18   Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

19   as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

20   625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The

21   ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and

22

23   [3] Plaintiff's brief lists the issues raised in a somewhat different manner and order – many
     of plaintiff's listed issues overlap to a significant degree, and the issues are not presented in an
24   order that logically comports with the Commissioner's sequential evaluation process.  For
     example, in order to meaningfully review the ALJ's determinations regarding severity at step two
25   and listing at step three, it is first necessary to determine whether the medical opinion evidence
     was properly weighed and considered.  Accordingly, the court has set forth the issues presented
26   in a manner that more logically comports with the sequential evaluation process.

1  resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations

2  omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more

3  than one rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

4  IV.   DISCUSSION

5       A.   Summary of the ALJ's Findings

6            The ALJ evaluated plaintiff's entitlement to SSI pursuant to the Commissioner's

7  standard five-step analytical framework for determining eligibility for adults who file new

8  applications.[4]

9

10  _____

    [4]  Disability Insurance Benefits are paid to disabled persons who have contributed to the
    Social Security program.  42 U.S.C. §§ 401 et seq.  Supplemental Security Income is paid to

11  disabled persons with low income.  42 U.S.C. §§ 1382 et seq.  Both provisions define disability,
    in part, as an "inability to engage in any substantial gainful activity" due to "a medically

12  determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).
    A parallel five-step sequential evaluation governs eligibility for benefits under both programs.

13  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S.
    137, 140-42, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

14
             Step one:  Is the claimant engaging in substantial gainful
15           activity?  If so, the claimant is found not disabled.  If not, proceed
             to step two.
16           Step two:  Does the claimant have a "severe" impairment?
             If so, proceed to step three.  If not, then a finding of not disabled is
17           appropriate.
             Step three:  Does the claimant's impairment or combination
18           of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
             404, Subpt. P, App.1?  If so, the claimant is automatically
19           determined disabled.  If not, proceed to step four.
             Step four:  Is the claimant capable of performing his past
20           work?  If so, the claimant is not disabled.  If not, proceed to step
             five.
21           Step five:  Does the claimant have the residual functional
             capacity to perform any other work?  If so, the claimant is not
22           disabled.  If not, the claimant is disabled.

23  Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

24       The claimant bears the burden of proof in the first four steps of the sequential evaluation
    process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the
25  burden if the sequential evaluation process proceeds to step five.  Id.

26       When redetermining eligibility for SSI for an individual who had turned 18, had become

1          The first step of the sequential evaluation process, which pertains to substantial

2  gainful activity, is not used for redetermining disability at age 18.  (AT 11); see also 20 C.F.R. §

3  416.987(b).  At step two, the ALJ determined that, since May 1, 2009, plaintiff has had the

4  following severe impairment: asthma.  (AT 12.)  However, at step three, the ALJ determined

5  that, since May 1, 2009, plaintiff did not have an impairment or combination of impairments that

6  meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

7  (AT 17.)

8          Before proceeding to step four, the ALJ assessed plaintiff's residual functional

9  capacity ("RFC") as follows:

> After careful consideration of the entire record, the undersigned
> finds that since May 1, 2009, the claimant has had the residual
> functional capacity to perform medium work as defined in 20 CFR
> 416.967(c) except she must avoid even moderate exposure to
> fumes, odors, dust, gases, poor ventilation, etc.

13  (AT 18.)

14          At step four, the ALJ found that plaintiff had no past relevant work.  (AT 20.)  At

15  step five, the ALJ noted that plaintiff was a younger individual age 18-49, had a limited

16  education, and was able to communicate in English.  (Id.)  The ALJ then found that, since May 1,

17  2009, considering the claimant's age, education, work experience, and residual functional

18  capacity, there were jobs that existed in significant numbers in the national economy that plaintiff

19  could perform.  (Id.)  The ALJ relied on the testimony of a vocational expert ("VE"), who

20  testified that plaintiff would be able to perform the following representative occupations: (1) day

21  worker, an unskilled medium exertional level occupation with 5,300 positions in the Sacramento

22  area, 95,000 positions in California, and 887,000 positions nationally; (2) factory worker, an

23  unskilled medium exertional level occupation with 1,000 positions in the Sacramento area,

---

eligible for SSI benefits as a child, and had been eligible for such benefits for the month before
the month in which the individual attained age 18, the Commissioner uses the rules for adults
who file new applications and not the rules for medical improvement review.  See 20 C.F.R. §
416.987.

23,400 positions in California, and 409,000 positions nationally; and (3) bench assembler, an unskilled light exertional level occupation with 290 positions in the Sacramento area, 34,000 positions in California, and 218,000 positions nationally.  (AT 21.)

Accordingly, the ALJ concluded that plaintiff's disability had ended on May 1, 2009, and that plaintiff had not become disabled again since that date.  (AT 21.)

B.  Plaintiff's Substantive Challenges to the Commissioner's Determinations

Before proceeding to plaintiff's specific arguments, the court finds it appropriate to summarize the pertinent medical and other documentary evidence.

A March 25, 2009 assessment report and other records from the Folsom Cordova Unified School District show that plaintiff was in 12th grade and in an individualized education program ("IEP") with deficits in the areas of auditory processing, sensory-motor skills, and cognitive abilities, including basic reading skills and reading comprehension.  (AT 280-99.)  The report indicated that plaintiff demonstrated "an inability to learn which cannot be explained by intellectual, sensory, or other health factors" and that the discrepancy between her predicted and actual achievement was "not primarily the result of a visual, hearing or motor impairment; mental retardation; a serious emotional disturbance; or environmental, cultural difference, or economic disadvantage."  (AT 283.)  The report also indicated that plaintiff's attendance was poor, but that her behavior was age appropriate, she had consistently tested in the low average range of intellectual ability, she had good verbal skills, she was capable of average performance in her classes if she applied herself, and that she needed to complete her Economics credits to graduate.  (AT 281-82, 284-85.)  Plaintiff was placed in general education classes and special education classes in a 50/50 ratio, was allowed extended time for completing tests and assignments, and was permitted to have test questions read aloud to her or presented with the use of an audio CD.  (AT 287, 290, 293.)

On March 31, 2009, plaintiff was evaluated by consultative examining psychologist Dr. Janice Nakagawa.  (AT 300-03.)  Plaintiff reported that she had learning

1   problems, had been in special education classes all her life, and had received treatment for

2   asthma with a "breathing machine." (AT 300.)  Dr. Nakagawa reviewed plaintiff's previous

3   treatment notes from the Molina Clinic, which indicated "possible anxiety and treatment for

4   asthma." (Id.)  During the evaluation, plaintiff stated that she did not know where she was born

5   or raised, she did not know if her mother worked (despite plaintiff having daily contact with her),

6   she did not know where her father lived (despite plaintiff reporting contact with him a couple of

7   days prior to the assessment), and she had "five or four brothers" but did not know their ages.

8   (Id.)  Plaintiff stated that she lived with her brother and sister-in-law, who prepared her meals

9   and took her to school, and that she did not do any chores, but only did some homework and

10   watched TV. (AT 301.)  Plaintiff initially claimed not to know her height, did not know her

11   weight, gave "grossly inaccurate responses" to the date and sequence of days in a week, did not

12   know the shape of a ball, and claimed that birds have no legs.  (Id.)  Plaintiff stated that she had

13   received counseling and anger management classes, but did not remember when or why.  (Id.)

14           Dr. Nakagawa described plaintiff as a "vague, imprecise informant with the

15   impression she was making efforts to present in a negative light," noting that there was

16   "hesitancy in her response style to emphasize limitations and had a contrived element." (AT

17   300-01.)  Plaintiff's mood was quiet and her affect non-labile. (AT 301.)  During cognitive and

18   memory testing, plaintiff "put forth very limited, inconsistent effort in all testing with the

19   impression she presented in the worst possible light for secondary gain." (Id.)  Dr. Nakagawa

20   declined to report plaintiff's IQ scores because of malingering, and opined that the test data was

21   considered unreliable and invalid.  (AT 301-02.)  Indeed, plaintiff's performance on all of the

22   tests administered suggested malingering, which was confirmed by Dr. Nakagawa's

23   administration of the Test of Memory Malingering ("TOMM"), described by Dr. Nakagawa as

24   the "well-normed test to screen for malingering" and that produced results consistent with

25   malingering.  (AT 302-03.)  Consequently, Dr. Nakagawa diagnosed malingering and stated that

26   it was impossible to provide any accurate assessment or opinion about plaintiff's functional

1    capabilities with respect to work.  (AT 303.)

2           Thereafter, on April 1, 2009, plaintiff also underwent a complete internal

3    medicine evaluation by consultative examining physician Dr. Joseph M. Garfinkel.  (AT 304-08.)

4    Plaintiff's chief complaints were listed as lower back pain and asthma – she reported having

5    asthma attacks every week or two and frequently using an inhaler.  (AT 304.)  She described her

6    back pain as non-radiating – worse with lying on the ground and stretching and better with

7    medication – and indicated that she did not use an assistive device.  (Id.)  Dr. Garfinkel reviewed

8    plaintiff's prior medical records and performed a physical examination.  (AT 305.)  With respect

9    to plaintiff's lungs, he noted that her breath sounds were symmetric, there were no rhonchi or

10   rales, and the expiratory phase was within normal limits.  (AT 306.)  Plaintiff had no chest

11   tenderness, and cardiovascularly had normal heart sounds and no murmur.  (Id.)  Dr. Garfinkel

12   found that plaintiff had mostly normal range of motion, a normal straight leg raising test, no back

13   spasm, good tone bilaterally with good active motion, 5/5 strength in all extremities, intact

14   sensation, normal reflexes, and a normal gait, and plaintiff was able to stand and walk on heels

15   and toes.  (AT 306-07.)  Dr. Garfinkel diagnosed plaintiff with chronic back pain (possibly

16   lumbosacral strain) and a history of asthma.  (AT 307.)  He opined that plaintiff could lift or

17   carry 50 pounds occasionally and 25 pounds frequently; stand or walk for 6 hours in an 8-hour

18   day; and sit for 6 hours in an 8-hour day.  (AT 308.)  He assessed no postural, manipulative,

19   visual, communicative, or environmental limitations.  (Id.)

20          On April 8, 2009, state agency physician Dr. DeSouza reviewed the record

21   evidence and opined that plaintiff physically had no exertional limitations.  (AT 311-15.)

22   However, Dr. DeSouza assessed environmental limitations – in particular, that plaintiff should

23   avoid concentrated exposure to extreme heat, fumes, odors, dusts, gases, poor ventilation, etc.

24   (AT 314.)

25          On May 7, 2009, state agency psychologist Dr. Norman Zukowsky also reviewed

26   plaintiff's records, including records from Molina Medical Center and plaintiff's psychological

8

and internal medicine consultative evaluations.  (AT 316-30.)  Dr. Zukowsky stated that there was insufficient evidence to make a determination regarding plaintiff's mental limitations due to plaintiff's lack of effort in the consultative evaluation.  (AT 330.)

A December 9, 2009 Annual Medication Service Plan from Sacramento County Mental Health lists a diagnosis of major depression with psychotic features, rule out bipolar disorder, with economic problems and "other psychosocial and environmental problems," and a GAF of 45.[5]  (AT 274.)  Plaintiff's Abilify prescription was increased from 5 to 10 mg and she was also prescribed Prozac 20 mg.  (Id.)  Another undated note reflects an assessment of major depression with psychotic features versus bipolar disorder with psychotic features and shows that plaintiff was referred to the "Wellness Recovery Center or Consumer Self-Help for activities or peer support."  (AT 272.)

In a January 7, 2010 progress note from Sacramento County Mental Health, Dr. Gregory Jaeck reported that plaintiff usually took her medication, that her response to the medication was fair, and that she denied any side effects.  (AT 273.)  Plaintiff stated that she continued to hear voices, but that her mood had improved from 4/10 to 6/10.  (Id.)  Dr. Jaeck observed that plaintiff was neatly dressed, groomed, and oriented with a cooperative attitude, slow motor activity, restricted affect, thought processes/content linear and within normal limits, average intellect, and fair insight and judgment.  (Id.)  He noted that plaintiff's vegetative symptoms had improved, including not spending all day in bed, being more active, and not having passive or active suicidal ideations, but that she was still struggling with energy and enjoyment.  (Id.)  He increased her Prozac prescription to 30 mg and increased her Abilify prescription to 15 mg, instructing her to return in about six weeks.  (Id.)  The record contains no

---

[5]  GAF is a scale reflecting "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).  A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id.

1   documentation of further visits with Dr. Jaeck.

2              Subsequently, on January 8, 2010, consultative examining psychologist Dr. Debra

3   Moore performed another consultative evaluation of plaintiff.  (AT 340-43.)  Plaintiff

4   complained of stress and mental illness.  (AT 340.)  During this evaluation, plaintiff was able to

5   provide more information about her family and living situation, but stated that she "can't be

6   around a lot of people.  I want to be alone all the time.  I feel bad about myself, the way I look

7   and dress.  I get really anger [sic] and stressed, and sometimes I get anxiety attacks." (Id.)  She

8   also stated that "I don't have the strength to look for work and I'm allergic to a lot of stuff." (AT

9   341.)  Plaintiff further stated that she had a hard time sleeping at night, that she basically slept all

10  day, and that she had no clue about her height or weight due to her bad memory.  (Id.)  Dr. Moore

11  noted that plaintiff's medical history was remarkable for asthma, but that she was not treated

12  with any medications at that time, although plaintiff apparently took low doses of Prozac,

13  Abilify, and Diphenhydrane for depression and sleep.  (Id.)

14             Upon a mental status examination, Dr. Moore described plaintiff as manipulative,

15  noting that:

16         She was resistant and unwilling to participate in the testing
           process.  None of her statements appeared genuine.  Her behavior
17         and statements seemed staged in order to gain sympathy from me.
           The claimant is an attractive woman.  She was dressed in the latest
18         fashion and her clothing was clean and appropriate.  Her grooming
           and hygiene were very good ... Her speech was coherent.  She had
19         no difficulty following conversation.  Her mood and affect were
           appropriate.  She was oriented to person, place and time.
20         Psychomotor activity was within normal limits.  There was no
           evidence of delusions.  No thinking impairment was observed and
21         Ms. Clay denied experiencing auditory or visual hallucinations.
           Her insight was poor.  She was able to be goal directed.
22

23  (AT 342.)  Dr. Moore administered cognitive and memory tests, but did not record the results due

24  to plaintiff's "need to feign memory and cognitive impairment."  (Id.)  Dr. Moore did not view

25  plaintiff's scores as accurate, explaining that plaintiff "was asked several times to work to the

26  best of her ability but refused.  She was clearly informed that without her full cooperation her

                                          10

results would not be reported, yet she continued to refuse to participate in the testing process."
(Id.)  Dr. Moore diagnosed plaintiff with malingering and depression (per plaintiff's report).  (AT 343.)  Dr. Moore opined that although plaintiff does have some level of impairment, she was unable to determine the true capacity of plaintiff's memory and intellectual abilities due to plaintiff's malingering.  (AT 342.)

On January 20, 2010, state agency physician Dr. Amon reviewed plaintiff's records and assessed environmental limitations only, opining that plaintiff should avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc.  (AT 344-48.)

On April 9, 2010, state agency psychiatrist Dr. Meenakshi also reviewed plaintiff's records, including plaintiff's previous school records and consultative psychological evaluations, and opined that there was insufficient evidence to make a determination regarding plaintiff's mental limitations due to her malingering.  (AT 349-59, 360-63.)

A one-page May 3, 2010 letter by Dr. H. Soliman on letterhead of the Consumers Self Help Center Wellness & Recovery stated that plaintiff "is a patient at the Wellness and Recovery Center.  She is currently being treated for mental health condition [sic] the symptoms of which make it difficult for her to maintain employment.  Working exacerbates her symptoms.  Please contact our clinic if you have any further questions."  (AT 380.)  However, the letter contained no address or contact information.  (Id.)

The record also contains a one-page February 24, 2011 letter by an individual named William Smith Waters on letterhead of the Consumers Self Help Center Wellness & Recovery, this time with an address and telephone number.  (AT 389.)  It is unclear from the letter whether William Smith Waters is a physician or an administrative employee, and the letter largely repeated the contents of Dr. Soliman's letter.  (Id.)  Specifically, the letter states that plaintiff "was a patient at the Wellness and Recovery Center beginning November 10, 2009 and
////
////

1    was discharged on [July 12, 2010].[6]  She was being treated for mental health condition [sic] the

2    symptoms of which made it difficult for her to maintain employment.  Working exacerbates her

3    symptoms of depression.  Our records noted her diagnosis as of December 9, 2009 is as follows;

4    Major Depression with psychotic features (296.34).  Please contact our clinic if you have any

5    further questions."  (Id.)

6         With this record evidence in mind, the court now turns to plaintiff's specific

7    arguments.

8              1.   Whether the ALJ failed to adequately develop the record

9         Plaintiff first contends that the ALJ failed to adequately develop the record – more

10   specifically, that the ALJ did not make sufficient efforts to obtain the alleged remainder of

11   plaintiff's mental health treatment records, and failed to contact plaintiff's treating providers or

12   subpoena their testimony for further clarification of their opinions.  This argument is devoid of

13   merit.

14        It is well established that a claimant bears the burden of providing medical and

15   other evidence that support the existence of a medically determinable impairment.  Bowen v.

16   Yuckert, 482 U.S. 137, 146 (1987); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998) ("At all

17   times, the burden is on the claimant to establish her entitlement to disability insurance

18   benefits.").  Indeed, it is "not unreasonable to require the claimant, who is in a better position to

19   provide information about his own medical condition, to do so."  Yuckert, 482 U.S. at 146 n.5.

20        Nevertheless, as the Ninth Circuit Court of Appeals has also explained:

21        The ALJ in a social security case has an independent duty to fully
          and fairly develop the record and to assure that the claimant's
22        interests are considered.  This duty extends to the represented as
          well as to the unrepresented claimant.  When the claimant is
23        unrepresented, however, the ALJ must be especially diligent in
          exploring for all the relevant facts ... The ALJ's duty to develop the

24   _____

25        [6] The letter actually stated that plaintiff was discharged on July 12, 2009, but the ALJ
     presumed, as does this court, that the reference to July 12, 2009 was a clerical error and that the
26   writer intended to state that plaintiff was discharged on July 12, 2010.  (AT 13, 389.)

1   record fully is also heightened where the claimant may be mentally
    ill and thus unable to protect her own interests.  Ambiguous
2   evidence, or the ALJ's own finding that the record is inadequate to
    allow for proper evaluation of the evidence, triggers the ALJ's duty
3   to conduct an appropriate inquiry.

4   Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (citations and quotation marks

5   omitted).  "The ALJ may discharge this duty in several ways, including: subpoenaing the

6   claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing,

7   or keeping the record open after the hearing to allow supplementation of the record."  Id.

8   However, as some courts have persuasively observed, the ALJ "does not have to exhaust every

9   possible line of inquiry in an attempt to pursue every potential line of questioning.  The standard

10  is one of reasonable good judgment."  Hawkins v. Chater, 113 F.3d 1162, 1168 (10th Cir. 1997)

11  (citation omitted).

12          Here, the ALJ continued the case at the first October 7, 2010 hearing to provide

13  plaintiff with an opportunity to obtain counsel.  (AT 78-87.)  Then, at the second December 7,

14  2010 hearing, the ALJ noted receipt of the short May 3, 2010 letter by Dr. Soliman, but

15  expressed concern about the lack of medical evidence and treatment records, and again continued

16  the hearing to supplement plaintiff's medical records.  (AT 67-77.)  Plaintiff represented that she

17  had more medical evidence, that she had switched from treatment by Dr. Soliman at the

18  Consumers Self Help Center (which she testified was getting ready to shut down) to treatment by

19  another doctor at The Effort, and that she was not receiving treatment from anywhere else.  (AT

20  72-75, 269.)  The ALJ indicated that he would order plaintiff's medical records from the

21  Consumers Self Help Wellness and Recovery Center and from The Effort.  (Id.)

22          On December 27, 2010, the Commissioner received a letter-brief dated December

23  7, 2010, prepared by Legal Services of Northern California on plaintiff's behalf.  (AT 268-76.)

24  The letter-brief attached the above-mentioned December 9, 2009 Annual Medication Service

25  Plan for Sacramento County Mental Health, the January 7, 2010 progress note by Dr. Jaeck, the

26  undated form documenting a referral to "Wellness Recovery Center or Consumer Self-Help for

13

1   activities or peer support," and a list of plaintiff's medications, for a total of about 5 pages.  (AT

2   272-76.)  Thereafter, on January 12, 2011, the Commissioner sent plaintiff a letter indicating that

3   it had requested records from the Wellness and Recovery Center and The Effort, but that it had

4   not received a response.  (AT 267.)  The letter requested plaintiff to urge her treating sources to

5   send her medical records to the Commissioner as soon as possible, and reminded plaintiff to also

6   forward any records in her possession that had not already been provided.  (Id.)

7           Subsequently, at the third January 27, 2011 hearing, the ALJ noted that he had not

8   received any further documents from the Wellness and Recovery Center or The Effort in

9   response to the Commissioner's requests.  (AT 43-45, 53-54.)[7]  Plaintiff then stated that she was

10  receiving mental health treatment from a Dr. Weinstock at The Effort and that he had apparently

11  faxed records to the ALJ.  (AT 39-41.)  The ALJ ultimately agreed to leave the record open for

12  another 30 days to allow plaintiff to send in any additional medical evidence she had or could

13  obtain from her treating sources.  (AT 64-65.)  The ALJ never received any further evidence from

14  plaintiff's treating sources, except for the above-mentioned one-page February 24, 2011 letter by

15  William Smith Waters from the Wellness and Recovery Center, which attached no medical

16  records.  (AT 389.)

17          As is evident from the discussion above, the ALJ made significant efforts to fully

18  and fairly develop the record by granting appropriate hearing continuances, requesting records

19  from plaintiff's treating sources directly, reminding plaintiff at the hearing(s) and by letter to urge

20  her treating sources to respond to the Commissioner's requests, and granting plaintiff additional

21  time to supplement the record with medical evidence.  Additionally, in light of the limited mental

22  health evidence, plaintiff was twice sent for consultative evaluations, both of which resulted in

23

24          [7] From ALJ Slocum's discussion with plaintiff at the hearing, it appears that he had not
    noticed the limited records attached to the above-mentioned December 7, 2010 letter brief that
25  plaintiff herself had sent in and was stamped as received on December 27, 2010.  (AT 268-76.)
    However, ALJ Slocum's oversight at the time was harmless, because these records were clearly
26  later considered and discussed by ALJ De Pietro in the written decision.  (See, e.g., AT 13.)

1    insufficient evidence of mental limitations due to malingering.  Although plaintiff argues that the

2    ALJ should also have contacted, or subpoenaed the testimony of, plaintiff's treating providers,

3    plaintiff cites no authority for the proposition that an ALJ is required to pursue every possible

4    line of inquiry even when reasonable methods of obtaining the relevant information had already

5    been used.[8]

6           The court declines to create such a new and onerous requirement and instead

7    leaves it to the sound discretion of the ALJ to determine which methods are best suited to fairly

8    develop the record in a particular case, applying a rule of "reasonable good judgment."  Hawkins,

9    113 F.3d at 1168.  While it may be difficult in some borderline cases to determine whether

10   further record development was warranted, that problem is not present in this case.  Here, the

11   ALJ undoubtedly went above and beyond to give an unrepresented claimant with alleged mental

12   impairments a meaningful opportunity to present her case and develop the record regarding her

13   mental health impairments and treatment.

14          Plaintiff raises an additional issue as to the medical evidence of record, noting that

15   although the Commissioner had been in possession of plaintiff's records from the Molina

16   Medical Group/Clinic (where plaintiff received primary health care services from about October

17   1994 to September 2009) and the Eastern Medical Center (where plaintiff was seen on November

18   3, 2009), these records were not included in the present administrative transcript.  (AT 114.)  The

19   Commissioner concedes that the actual records were inexplicably not included in the

20   administrative transcript, but argues that the issue is essentially a red herring.  The court agrees.

21   ////

22

23          [8] To be sure, 20 C.F.R. § 404.1512(e) indicates that the Commissioner must make a
     reasonable effort to obtain evidence from a plaintiff's own medical sources.  However, as
24   discussed above, the ALJ made such reasonable efforts in this case.  Moreover, the problem with
     the opinions of plaintiff's treating providers is not that they contained some ambiguity that could
25   potentially be easily resolved by contacting the providers for clarification – instead, as discussed
     further below, the treating providers' opinions were for the most part entirely conclusory and
26   minimally supported.

1    Although the actual records do not appear in the administrative transcript, they

2    were summarized in the disability hearing officer's May 12, 2010 decision, as well as in the case

3    analysis reports reviewed and signed by the state agency physicians.  (AT 114-15, 118, 327-28,

4    360-61.)  Significantly, the records from both the Molina Medical Group and the Eastern

5    Medical Center primarily relate to plaintiff's physical ailments, including her asthma.  (Id.)

6    However, the ALJ found plaintiff's asthma to be a severe impairment, he incorporated the most

7    restrictive asthma limitations in the record into the RFC (AT 18, 347), and plaintiff does not

8    challenge the ALJ's findings with respect to plaintiff's physical limitations in her briefing before

9    this court.  Indeed, at the administrative hearing, plaintiff did not claim any distinct physical

10   problems as the basis of her alleged disability.  (AT 41-42.)

11       During a March 2008 visit to the Molina Medical Group, plaintiff did report

12   episodes of panic attacks/social phobias and requested a mental health referral, but a subsequent

13   September 2008 treatment note only revealed a complaint of a sore throat.  (AT 328.)  The final

14   September 2, 2009 treatment notes from Molina Medical Group indicated that plaintiff requested

15   refills for her asthma medication and a pregnancy test, and that her examination was otherwise

16   normal.  (AT 361.)  As such, these records do not appear to contain any probative information

17   regarding plaintiff's mental health in addition to what already appears in the administrative

18   transcript.  Most of the Molina Medical Group records also relate to the period prior to May 1,

19   2009, the date that plaintiff's disability was found to have ended.  Moreover, consultative

20   examining psychologist Dr. Nakagawa specifically indicated on March 31, 2009, that she had

21   reviewed plaintiff's treatment notes from the Molina Medical Group, which would have included

22   the March 2008 note regarding plaintiff's reported mental symptoms.  (AT 300.)  Therefore,

23   these records were actually considered by Dr. Nakagawa in formulating her opinion, on which

24   the ALJ in turn relied.

25       Accordingly, the court finds that the Commissioner's failure to include the records

26   from the Molina Medical Group and the Eastern Medical Center in the administrative transcript

was inconsequential to the ultimate non-disability determination.  See Curry v. Sullivan, 925

F.2d 1127, 1129 (9th Cir. 1990) (harmless error analysis applicable in judicial review of social

security cases).

> 2.      Whether the ALJ improperly weighed the medical and psychological
>         opinion evidence

Plaintiff also contends that the ALJ improperly rejected the opinions of plaintiff's

treating providers regarding her mental impairments and gave undue weight to the opinions of

the consultative examining psychologists and the state agency physicians.

The weight given to medical opinions depends in part on whether they are

proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).

Ordinarily, more weight is given to the opinion of a treating professional, who has a greater

opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d

1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to

considering its source, the court considers whether (1) contradictory opinions are in the record;

and (2) clinical findings support the opinions.  An ALJ may reject an uncontradicted opinion of a

treating or examining medical professional only for "clear and convincing" reasons.  Lester, 81

F.3d at 830-31.  In contrast, a contradicted opinion of a treating or examining professional may

be rejected for "specific and legitimate" reasons.  Lester, 81 F.3d at 830.  While a treating

professional's opinion generally is accorded superior weight, if it is contradicted by a supported

examining professional's opinion (supported by different independent clinical findings), the ALJ

may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

////

////

1  weigh the contradicted treating physician opinion, Edlund, 253 F.3d at 1157,[9] except that the ALJ

2  in any event need not give it any weight if it is conclusory and supported by minimal clinical

3  findings.  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory,

4  minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a

5  non-examining professional, without other evidence, is insufficient to reject the opinion of a

6  treating or examining professional.  Lester, 81 F.3d at 831.

7          The court finds that the ALJ permissibly gave little weight to the opinions of

8  plaintiff's treating providers, because they are conclusory and supported by minimal clinical

9  findings.  The May 3, 2010 letter by Dr. Soliman and the February 24, 2011 letter by William

10 Smith Waters (who may or may not be a physician) are entirely conclusory, stating merely that

11 plaintiff's symptoms make it difficult for her to maintain employment and that working

12 exacerbates her symptoms.  (AT 380, 389.)  Dr. Soliman's letter did not even list a diagnosis.

13 (AT 380.)  Both letters are unaccompanied by any clinical findings, test results, or therapy/visit

14 notes.  "The ALJ need not accept an opinion of a physician-even a treating physician-if it is

15 conclusory and brief and is unsupported by clinical findings."  Matney v. Sullivan, 981 F.2d

16 1016, 1019 (9th Cir. 1992) (citing Magallanes, 881 F.2d at 751); see also Tonapetyan, 242 F.3d

17 at 1149 (holding that the ALJ properly rejected the opinion of a treating physician because it was

18 "unsupported by rationale or treatment notes, and offered no objective medical findings to

19 support the existence of [the claimant's] alleged conditions").

20         As the ALJ also noted, in addition to the lack of treatment records or

21 documentation over a significant period of time, there is also little foundation for Dr. Soliman

22 and Dr./Mr. Smith Waters's form opinions that working exacerbated plaintiff's symptoms,

23 because plaintiff had never worked and "pretty consistently testified that she has never even

24 _____

25     [9]  The factors include: (1) length of the treatment relationship; (2) frequency of
    examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
26  (5) consistency; (6) specialization.  20 C.F.R. § 404.1527.

1   looked for work." (AT 13, 36-37.)

2          While Dr. Jaeck provided at least some notes in his January 7, 2010 assessment of

3   plaintiff, most of his clinical findings are fairly benign. (AT 273.) Although plaintiff had a

4   restricted affect and slow motor activity, and she claimed to hear voices and struggle with

5   "energy and enjoyment," Dr. Jaeck stated that plaintiff's mood had improved, she was oriented

6   and neatly dressed/groomed, she did not have suicidal or homicidal ideations, her attitude was

7   cooperative, her thought processes and content were linear and within normal limits, her intellect

8   was average, and her insight and judgment were fair. (Id.) Plaintiff's response to medications

9   was fair. (Id.) These findings do not necessarily suggest significant impairment, and the notes

10  provide no insight into plaintiff's work-related limitations. Dr. Jaeck's progress note does not

11  even explain the bases of the diagnoses of major depression with psychotic features and bipolar

12  disorder, and certainly does not support the very low GAF score, indicative of serious symptoms

13  and impairment, found in plaintiff's Annual Medication Service Plan at Sacramento County

14  Mental Health. (AT 272-74.) Additionally, there are no documented further visits with, or

15  treatment notes by, Dr. Jaeck, and the only findings appear to be from a single visit with plaintiff

16  (although the report, noting improvement, suggests that he may have seen plaintiff before). (AT

17  13, 273.) In light of this limited treatment relationship, as documented by very limited treatment

18  records, the ALJ also permissibly gave Dr. Jaeck's opinion reduced weight.

19          Plaintiff argues that more treatment records exist and that the ALJ should have

20  obtained them. For the reasons discussed above, the court finds that argument unpersuasive and

21  holds that, based on the record before the ALJ, he provided specific and legitimate reasons for

22  giving limited weight to the opinions of plaintiff's treating providers regarding her mental

23  limitations.

24          The ALJ also justifiably relied on the opinions of consultative examining

25  psychologists Drs. Nakagawa and Moore to conclude that there was insufficient evidence

26  regarding plaintiff's mental limitations. As outlined above, their diagnoses of malingering and

1    consequent opinions of insufficient evidence were based on in-person mental evaluations,

2    objective psychological testing, and their independent clinical findings, which were much more

3    detailed, thorough, and well supported than any of the findings in plaintiff's limited treatment

4    records.  As such, their opinions constituted substantial evidence on which the ALJ was entitled

5    to rely.

6            Plaintiff argues that the opinions of the consultative psychologists cannot

7    constitute substantial evidence, because these professionals were not provided with adequate

8    records regarding plaintiff's mental impairments.  In particular, plaintiff claims that the

9    consultative psychologists were not provided with copies of plaintiff's treatment records from

10   Molina Medical Group or the Eastern Medical Center, plaintiff's complete mental health

11   treatment records, plaintiff's school records, and the functional reports completed by plaintiff's

12   mother and sister.  Generally, the regulations require that a consultative examiner be provided

13   with a claimant's available medical or mental health treatment records.  See 20 C.F.R. § 416.917

14   ("If we arrange for [a consultative examination] or test, we will...also give the examiner any

15   necessary background information about your condition.").

16           For the same reasons discussed above in regards to the Commissioner's failure to

17   include plaintiff's records from Molina Medical Group and the Eastern Medical Center in the

18   administrative transcript, any failure to provide these records to the consultative psychologists

19   was harmless.  These records primarily relate to plaintiff's physical ailments, which were not the

20   subject of the psychological evaluations and are not an issue raised in plaintiff's briefing before

21   this court.  Moreover, Dr. Nakagawa specifically noted that she had reviewed plaintiff's records

22   from the Molina Medical Group, and she therefore considered them in formulating her opinion.

23   (AT 300.)

24           Additionally, the court finds that the very limited and largely conclusory treatment

25   records from plaintiff's treating providers that do appear in the administrative transcript could

26   not plausibly have changed the consultative psychologists' assessments.  Notably, this is not the

1   type of case where the Commissioner failed to provide a consultative examiner with well-

2   documented, detailed treatment notes and test results generated in the course of an extensive

3   treatment relationship.

4        Likewise, there is no indication that a review of plaintiff's school records would

5   have materially affected the opinions of the consultative psychologists.  Although plaintiff's

6   school records certainly show that she had a learning disability and was placed in an IEP with

7   special education services, both consultative psychologists were well aware that they were

8   evaluating plaintiff for an alleged learning disorder and/or cognitive impairments, among other

9   mental disorders.  (AT 300, 340.)  For this reason, plaintiff's speculative assertion that the

10  consultative psychologists would have provided plaintiff with more accommodations during the

11  testing process and would have interpreted her test results differently had they reviewed her

12  school records does not hold water.  Both Drs. Nakagawa and Moore were licensed psychologists

13  alerted to plaintiff's alleged difficulties, and it can reasonably be presumed that they had the

14  clinical expertise to administer the psychological tests correctly and distinguish true difficulties

15  with the test-taking process from malingering.  Their findings of malingering were based on their

16  personal evaluation and testing of plaintiff.

17       Furthermore, plaintiff's school records actually suggest that she is capable of far

18  more than what she represented to the consultative psychologists – even though plaintiff received

19  special education services and accommodations, such as extended time for completing

20  tests/assignments, the school records also note that plaintiff had consistently tested in the low

21  average range of intellectual ability, she had good verbal skills, she was capable of average

22  performance in her classes if she applied herself, and she was placed in general education classes

23  and special education classes in a 50/50 ratio.  (AT 280-87, 290, 293.)  Moreover, state agency

24  psychiatrist Dr. Meenakshi specifically reviewed plaintiff's school records along with the

25  evaluations of the consultative examining psychologists and nonetheless agreed that a finding of

26  insufficient evidence of mental limitations was appropriate.  (AT 363.)

Finally, plaintiff's argument that the Commissioner's failure to provide the consultative psychologists with functional reports/statements by plaintiff's mother and sister resulted in prejudicial error lacks merit.  As an initial matter, although the ALJ has to consider (and in this case, did consider) the lay testimony and statements of relatives, plaintiff provides no authority that such information, which does not constitute medical evidence, is necessarily required to be provided to a consultative examiner.

Moreover, the ALJ provided germane reasons for discounting the testimony of plaintiff's relatives. The Ninth Circuit has held that lay testimony as to a claimant's symptoms and functional limitations is "competent evidence that the ALJ must take into account" and "*cannot* be disregarded without comment." Molina v. Astrue, 674 F.3d 1104, 1114 (9th Cir. 2012) (emphasis in original) (citation and quotation marks omitted).  To discount competent lay witness testimony, the ALJ "must give reasons that are germane to each witness." Id.  However, the ALJ is not necessarily required "to discuss every witness's testimony on a individualized, witness-by-witness basis.  Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." Id.

Not surprisingly, plaintiff does not directly challenge the ALJ's determination regarding her own credibility before this court.  In support of his credibility determination, the ALJ pointed to the findings of malingering by the consultative examining psychologists. Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003) (nothing that an ALJ may reject a claimant's testimony upon finding evidence of malingering).  The ALJ also provided several other specific, clear, and convincing reasons for discounting plaintiff's testimony and statements, including the lack of supporting treatment records and the inconsistencies between plaintiff's statements.  (AT 13-14, 16, 18.)  For example, although plaintiff testified that she had to have someone with her when using the bus, because she "wouldn't be able to figure out where to get on or off," previous function reports indicated that plaintiff was able to independently use public transportation.  (AT

16, 116, 217, 226, 234.)  On January 7, 2010, plaintiff told Dr. Jaeck that she was having

auditory hallucinations, but the very next day, on January 8, 2010, plaintiff denied experiencing

auditory or visual hallucinations upon questioning by consultative examining psychologist Dr.

Moore.  (AT 273, 342.)

As the ALJ observed, many of these reasons for rejecting plaintiff's credibility

apply equally to the statements of plaintiff's relatives.  (AT 20.)  The ALJ also noted that

plaintiff's sister "failed to complete the questions on how much time she and her sister spend

together, how often they see each other, or what they do together, leaving the undersigned with

no basis, other than she and the claimant are sisters, for her information to be found credible.

This report also failed to answer, or noted "unknown" to a number of questions, again casting

doubt on the reporter's knowledge concerning the claimant's day to day activities and

functioning.  (AT 20, 231-38.)  Therefore, the ALJ provided germane reasons for discounting the

lay statements of plaintiff's relatives, and the consultative examining psychologists' failure to

review these statements did not result in prejudicial error.

In sum, the court finds that the ALJ appropriately gave little weight to the

opinions of plaintiff's treating providers and properly relied on the opinions of the consultative

examining psychologists, which constituted substantial evidence.  Also, because the opinions of

state agency psychologist Dr. Zukowsky and state agency psychiatrist Dr. Meenakshi were

consistent with the opinions of the consultative examining psychologists and the record evidence

as a whole, these opinions constituted additional substantial evidence on which the ALJ could

permissibly rely.  See Tonapetyan, 242 F.3d at 1149 (holding that a non-examining expert's

opinion "may constitute substantial evidence when it is consistent with other independent

evidence in the record.").  As such, the court finds no error in the ALJ's weighing of the opinion

evidence.

////

////

3.     Whether the ALJ erroneously found that plaintiff did not have a severe
       mental impairment at step two

An impairment or combination of impairments is not severe at step two "if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a). Generally, in evaluating a mental impairment, if there is no evidence of episodes of decompensation, and the claimant's degree of limitation with respect to activities of daily living; social functioning; and concentration, persistence, or pace are rated as "none" or "mild," the impairment will generally be found to be not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. See 20 C.F.R. § 416.920a(c), (d)(1).

In this case, the ALJ engaged in a detailed analysis of the available evidence, ultimately concluding that, when properly weighed, the evidence showed that plaintiff had at most mild limitation in activities of daily living; social functioning; and concentration, persistence, or pace; and had experienced no episodes of decompensation. (AT 12-17.) The ALJ also generally observed that:

> While [plaintiff] has a history of special education due to a learning disability documented in her school records, any current information about her mental functioning does not exist, due to the lack of treatment records, as well as the claimant's malingering behavior at both psychological exams conducted by the State Agency in an effort to establish a diagnosis as well as the effect it may or may not have on her working capacities. Thus, the record is insufficient to accurately assess her mental abilities. This record overall leads the undersigned to conclude that the claimant's medically determinable mental impairments of learning disorder and depression, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.

(AT 15.)

The court finds the ALJ's analysis to be supported by substantial evidence in the record as a whole. If a claimant fails to cooperate with the Commissioner in obtaining evidence, the ALJ is required to make a decision based on the available information. 20 C.F.R. § 416.916.

1    Although plaintiff posits a different interpretation of the evidence, the ALJ's determination at

2    step two was rational and well supported, and the court declines plaintiff's invitation to second

3    guess it.

4              Furthermore, even if the opinions in plaintiff's limited mental health treatment

5    records were fully credited, they do not necessarily show that plaintiff had a severe mental

6    impairment for a period of at least twelve (12) months.  42 U.S.C. § 1382c(a)(3)(A).  The letter

7    from William Smith Waters shows that plaintiff was a patient at the Wellness and Recovery

8    Center between November 10, 2009, and July 12, 2010, and the available mental health treatment

9    records are all from that discrete period.  (AT 272-74, 380, 389.)  Additionally, even assuming

10   *arguendo* that plaintiff's mental impairments should have been deemed severe at step two, any

11   such error was harmless.  The representative occupations that the ALJ found plaintiff could

12   perform based on the VE's testimony were all unskilled positions.  (AT 21.)  Nothing in the

13   present record evidence, as properly weighed by the ALJ, affirmatively suggests that plaintiff's

14   mental impairments, even if technically deemed severe at step two, would preclude her from

15   performing the representative unskilled positions at step five.

16              4.    Whether the ALJ erred in determining that plaintiff did not meet a listing

17              Finally, in light of the above discussion, plaintiff's argument that her

18   impairments meet or medically equal a listing is so insubstantial as not to merit any significant

19   consideration.  The record evidence does not even remotely establish that plaintiff's impairments,

20   singly or in combination, meet or equal the criteria of Listing 12.04 (affective disorders), Listing

21   12.05 (mental retardation), or any other listing.  Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990)

22   ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified

23   medical criteria ... For a claimant to qualify for benefits by showing that his unlisted impairment,

24   or combination of impairments, is 'equivalent' to a listed impairment, he must present medical

25   findings equal in severity to *all* the criteria for the one most similar listed impairment.")

26   (emphasis in original); see also Burch v. Barnhart, 400 F.3d 676, 683 (9th Cir. 2005) (explaining

1   that the claimant "bears the burden of proving that ... she has an impairment that meets or equals

2   the criteria of an impairment listed in Appendix 1 of the Commissioner's regulations.").

3          The low GAF score assigned on December 9, 2009, does not establish that

4   plaintiff meets or equals a listing.  As an initial matter, the GAF scale "does not have a direct

5   correlation to the severity requirements in [the Commissioner's] mental disorders listings."  65

6   Fed. Reg. 50746-01, at 50764-65 (Aug. 21, 2000).  Moreover, an ALJ is permitted to discredit a

7   GAF score where it is unsupported by objective evidence.  Clark v. Astrue, 2009 WL 542166, at

8   *6 (C.D. Cal. Mar. 4, 2009).  In light of the minimal and conclusory treatment records, the ALJ

9   justifiably gave the GAF score little weight.

10         Plaintiff also argues that the ALJ should have required consultative examining

11  psychologists Drs. Nakagawa and Moore to provide their raw scores and scales on plaintiff's IQ

12  test results to determine whether she met Listing 12.05 for mental retardation.  This argument

13  lacks merit, because both Drs. Nakagawa and Moore expressly found that the test scores were

14  invalid and unreliable because of plaintiff's malingering.  (AT 301-02, 342.)  Because those

15  conclusions were well supported by the consultative examining psychologists' reports, the ALJ

16  appropriately gave the test results no weight and was under no obligation to request the raw

17  scores from Drs. Nakagawa and Moore.

18         5.    Whether the Appeals Council erred in not remanding the case to the ALJ

19         Because the court finds no prejudicial error in the ALJ's analysis and

20  determinations, the court further concludes that the Appeals Council did not err in denying

21  plaintiff's request for review.

22  V.   CONCLUSION

23         For the foregoing reasons, the court finds that the ALJ appropriately developed

24  the record; that his findings were supported by substantial evidence in the record as a whole; and

25  that the Appeals Council did not err in denying plaintiff's request for review based on alleged

26  errors by the ALJ.

1          Accordingly, IT IS HEREBY ORDERED that:

2          1.     Plaintiff's motion for summary judgment (dkt. no. 14) is DENIED.

3          2.     The Commissioner's cross-motion for summary judgment (dkt. no. 15) is

4  GRANTED.

5          3.     Judgment is entered for the Commissioner.

6          4.     The Clerk of Court is directed to close this case.

7          IT IS SO ORDERED.

8  DATED:  April 15, 2013

9

10         _____
   KENDALL J. NEWMAN
11         UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26